No. 2:19-CV-00060 MCE_DB_PS

1

2

3

4

**FILED**

JUL 13 2020

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

5   Richard H. Francis, pro se
6   1820 Capitol Avenue, Apt #210
7   Sacramento, CA 95811
8   916,498-8427
9   TigerStripe-2@outlook.com

10

11                     UNITED STATES DISTRICT COURT

12              FOR THE EASTERN DISTRICT OF CALIFORNIA

13

14   RICHARD H. FRANCIS          /              No. 2:19-CV-00060 MCE_DB_PS

15              Plaintiff        /

16                                              AMENDED COMPLAINT

17                                              Judge: Hon. Deborah Barnes

18                                              Courtroom:  27, 8th Floor

19   Vs,

20              Defendants

21   LOS RIOS COMMUNITY COLLEGE /

22   DISTRICT, i.e. (LRCCD), (DISTRICT) /

23   1919 Spanos Court, Sacramento, CA 95825

24   General Council J.P. Sherry

1

AMENDED COMPLAINT

No. 2:19-CV-00060 MCE_DB_PS

1    New Defendants:

2    WAIVER OF SERVICE OF SUMMONS—Gordon ESQ

3    1)  Michael Gutierrez, SCC President, 916, 558-2101,

4    Rhoda Hall North room #277 at 3835 Freeport Blvd,

5    Sacramento CA. 95822; gutierm@scc.losrios.edu

6    Or 1390 Willow Pass Road, Suite 700, Concord, CA 94520.

7        Waiver of Service of Summons---Gordon ESQ

8    2)  Miguel Molina, Student Discipline Officer,

9    916, 558-2438 Student Services Office room 105-109

10   3835 Freeport Blvd, Sacramento CA. 95822, molina@scc.losrios.edu

11   Or 1390 Willow Pass Road, Suite 700, Concord, CA 94520.

12

13   <u>Attorneys for Defendants</u>

14   Louis A. Leone, SBN: 099874,

15   Seth L. Gordon, SBN: 262653,

16   1390 Willow Pass Rd, #700,

17   Concord, CA 94520,

18   925, 974-8600, Fax 925, 974-8601,

19   lleone@leonealberts.com

20   ///

2

AMENDED COMPLAINT

1    TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD

2          TAKE NOTICE that Plaintiff's Amended Complaint was filed in a timely manner

3    prior to its July 17th 2020 deadline. <u>Francis v LRCCD</u> was first filed on January 9th, 2019

4    against the DISTRICT and was dismissed on May 18th, 2020 "with leave to amend".

5          Although on 6/29/20 Defense Attorney, Gordon ESQ, awarded plaintiff a 'Waiver

6    of Service of Summons' plaintiff wants personal service for Molina and Gutierrez.

7          They should be made to retrieve their summons from the United States Marshal.

8    The USM will be sought to serve Summons on the new defendants—Dean Miguel

9    Molina and Sacramento City College, President, Michael Gutierrez, so that the legal

10   papers are personally served on them instead of by proxy.

11          This is so Molina and Gutierrez can be arrested for contempt of court when they

12   disobey the court order to re admit the plaintiff without restrictions, expunge his

13   suspension, and change their speech code policies.

14          Plaintiff's IFP status allows free 'service of processes' against DISTRICT's new

15   defendants.  Molina and Gutierrez are expected to be allusive, so as to avoid their

16   SUMMONS, and obstruct justice.  This aversion in indicative of both Molina's and

17   Gutierrez's refusal to return plaintiff's phone calls and e-mails about their addresses for

18   the Amended Complaint.  Plaintiff seeks to have the court make Molina and Gutierrez

19   come and pick their summons up at the U.S. Marshal's office, so as to authenticate

20   personal service.

21          Since both Molina and Gutierrez are public servants, the plaintiff request that

22   they be compelled by DISTRICT to pick-up their Summons at the U.S. Marshal's office.

3

AMENDED COMPLAINT

1       They should do this instead of having their personal addresses made public record as they

2       will appear on the Amended Complain.  They should cooperate and pick them-up instead

3       of having the US Marshals try to find them, or serve their proxy; notwithstanding the

4       WAIVER.  Defense attorney Gordon ESQ mailed and e-mailed to plaintiff a Wavier of

5       Service of Summons, so as to switch the personal addresses on the summons for

6       defendants' Molina and Gutierrez with the defense attorney's office address in Concord,

7       so that 'they' get the summons, somehow, instead of Molina and Gutierrez.  Gordon ESQ

8       wants to substitute for Molina and Gutierrez, but plaintiff wants defendants arrested if-

9       and-when they obstruct the court order without the loop hole created by them not being

10      personally served. Due to the waiver.  Plaintiff seeks to be readmitted without

11      harassment, have his creditability restored with an expungement, and have the speech

12      code policy eliminated.

13      Plaintiff figures Miguel Molina will seek to escape the consequences of violating

14      the court order by claiming he was not personally served, and then get away with

15      harassing plaintiff in his role as Dean after plaintiff wins this case, and gets the

16      injunction.  Therefore Plaintiff wants the court to compel Molina, Gutierrez, and Sherry

17      to show up at the court house and receive their summons from the U.S. Marshal's Office

18      on the 5th Floor of the I Street District Court in Sacramento, CA.

19      Plaintiff wants the procedure for the service of summons to have the necessary

20      power to have Molina and Gutierrez ARRESTED FOR CONTEMPT OF COURT when

21      they fail to execute the court order to readmit plaintiff to DISTRICT without harassment

22      and racial sensitivity class training, EXPUNGE THE RECORD, and make POLICY

23      CHANGES that are at issue in this case.

4

AMENDED COMPLAINT

1       Last time plaintiff had General Consul, J.P. Sherry, served the original Complaint

2       and Summons Mr. Sherry hid.    Plaintiff had to hire little 5'3", 76-y.o., tax paying

3       homeowner, Dian Castanza for 20-bucks to serve J.P Sherry and DISTRICT with the

4       original complaint.  This was just in the nick-of-time on 12/19/19.  Plaintiff got Ms.

5       Castanza, a regular at the Meals on Wheels, K Street Café, who he got to know, to deliver

6       Sherry's summon at DISTRICT's Office, because USM had not done so in a timely

7       manner.  This task required driving her there, showing her where, pointing her in the right

8       direction, and telling her what to say.  J.P. Sherry hid.  His bald head was spotted lurking

9       in the back cubical as she announced that she had a summons for him.

10      Mr. Sherry did not come out to address Ms. Casanza, instead he stayed-put in his

11      cubicle in the back, so that the receptionist, Nenette Harte, had to take the documents.

12      Then Defendant's Attorney, Leon ESQ, in his Motion to Dismiss proclaimed that since

13      Sherry was not personally served, he was therefore off the hook.

14      Sherry obstructed justice by ducking-off and having someone else receive the

15      papers, so he could stay "off the hook".  This trick creates an issue like what Gordon

16      ESQ attempts to do with his Molina/Gutierrez WAIVER.  The issue is whether-or-not

17      there was proper personal service of process, so Molina and Gutierrez can be arrested

18      later on for non-compliance to the court order in the injunction.

19      At DISTRICT's office in order to personally serve J.P. Sherry Ms. Castanza would

20      have had to trespass through their work spaces by barging-in back there, and sticking the

21      summons in J.P. Sherry's lap with plaintiff tagging along to point him out.  Under the

22      circumstances Ms. Casanza was left with no alternative than to give the legal briefs to

23      Receptionist, Nenette Harte.

5

AMENDED COMPLAINT

1    To avoid this technicality as to whether-or-not Molina and Gutierrez are

2    accountable for being in contempt of court because they were not personally served,

3    plaintiff wants the court to require Molina and Gutierrez to report to the USM for their

4    SUMMONS, and so it becomes personal service, instead of service by proxy.

5    Since the closure of the courthouse due to the Corona-Virus Scare created a

6    problem about getting the legal forms necessary for this AMENDED COMPLAINT, they

7    were copied on-line and pasted into M/S Word.  The Injunction Form and The Complaint

8    for Violation of Civil Rights form were obtained on line by going to:

9    www.caed.uscourts.gov/forms / 'Pro se'/ 'non-prisoner'/ 'civil' were selected and under

10   'sections' : "civil case /civil-rights violations'/ and 'injunctions were selected.

11   Documents were copied, pasted, reformatted separately, and added to follow in sequence

12   after the AMENDED COMPLAINT brief.  The INJUNCTIVE RELIEF, and CIVIL

13   RIGHTS VIOLATIONS are separate documents in the dossier as with the Service of

14   Process and the Declaration.

15   The Amended Complaint differs from the Original because :

16   • Plaintiff switched cash damages to injunctive relief, so as to circumvent the

17   11th Amendment's bureaucratic, financial-liability, immunity-protection,

18   loophole; so DISTRICT can't use the FR #12 to dismiss the case.  Yet, upon

19   review of the original complaint filed on 1/9/19 relief sought was not cash, but

20   an either-or-proposition of either firing the officials, or paying damages.

21

22   ///

6

AMENDED COMPLAINT

1       • Plaintiff changed his Federal Jurisdiction, U.S. Bill of Rights, Amendment,

2       Violations to include both the 14th and the 9th Amendments to the U.S.

3       Constitution, which includes the original First Amendment, freedom of

4       expression violation because of suspension for the college essays, which are

5       considered SPEECH.

6       • Plaintiff added new DISTRICT defendants—Dean Molina and SCC President

7       Gutierrez, who are necessary to fulfill the injunction's eventual court order.

8       The DISTRICT's 'torch bearers' is switched from General Counsel, J.P. Sherry to

9       Molina and Gutierrez, since the injunctive relief involves the job functions of Dean

10      Molina and SCC President Gutierrez, instead of J.P. Sherry.  Molina and Gutierrez are

11      necessary to enact the eventual court order, which will be to re-admit Plaintiff ASAP

12      without the mandated RACIAL SENITIVITY CLASS TRAINNG.  The other

13      components of the injunction like: disciplinary record expungement, and policies changes

14      that reflect free expression may require J.P. Sherry, who should also go to jail for

15      contempt, if he refuses to change the speech code policies.

16      Injunctive relief allows the case to focus on academic administration, instead of

17      cash damages.  Cash is barred from recovery by the 11th Amendment.  Plaintiff originally

18      recommended that DISTRICT fire officials for their roles in their school's

19      unconstitutional, speech-code, regulation, policy enforcement against plaintiff.  This was

20      entered as an alternative to money damages, but was not considered worthy as a non-cash

21      relief award for damages caused by those people, who served as government

22      functionaries.  Their collusion was official misconduct.

7

AMENDED COMPLAINT

No. 2:19-CV-00060 MCE_DB_PS

1.  The first condition to this injunctive relief is immediate reinstatement without any special, ethnic, sensitivity, mind-control sessions, which Dean Molino requires plaintiff to fulfill.  Molina demands that plaintiff pay-for, attend, and pass a special multi-cultural, sensitivity, class in order to qualify for re-admittance to plaintiff's community college.  Dean Molina calls this extra requirement: "RACIAL SENITIVITY CLASS TRAINING" in his 10/23/18 official letter to plaintiff.  A copy of this document has already submitted with the original complaint, dated 10/23/18, and addressed from Dean Molina's office.  That ruling was then confirmed by Gutierrez on 12/12/18 in a document mailed from his office.  Both are official documents from Sacramento City College, a satellite of the DISTRICT, and are exhibits in the original complain, which show direct complicity.

2.  Second condition to this injunctive relief is expungement.  Since case law and Supreme Court rulings support plaintiff's position, plaintiff wants this injunction to clear him of wrong doing. Plaintiff wants whatever reference to this matter be removed from plaintiff's school record.

3.  Thirdly, plaintiff seeks District to make policy changes to conform to the Freedom of Speech protocol established by the 1st Amendment and 14th Amendment within the expectations of the 9th Amendment, stare decisive, and the Supreme Court Decisions regarding free speech and written expression.

Plaintiff opposes this RACIAL SENITIVITY CLASS TRAINING as part of the re-admissions process because it's intended to punish.  Since their speech code is

8

AMENDED COMPLAINT

1    unconstitutional and plaintiff position regarding the first Amendment is correct, adding

2    this RACIAL SENITIVITY CLASS TRAINING provision is harassment.

3         Plaintiff already finished classes' like that racial sensitivity thing such as:

4    1) Multicultural policing, 2) Social Psychology, and 3) Forensic Anthropology have

5    already been taken there at SCC.   Plaintiff earned a Master's of Arts Degree in

6    Cultural Anthropology from California State University, Sacramento in 1976; and

7    then achieved an M.P.A. there in 1979 where similar kinds requirements were taken

8    about race, culture, and special treatment.  Cultural relativity, social conditioning,

9    biological evolution, genetics, and minority hiring preferences have all been studied

10   already.  Racial-sensitivity-like classroom courses have all been taken and passed

11   from 1974 through 2014.

12        Plaintiff is already well aware of special interest groups, sub-cultures, and

13   the war against White people by persons-of-color as they seek to fulfill their racial-

14   agendas.  For instance, at the American Anthropological Association conference at

15   California State University, Fresno in 1975 plaintiff witnessed members of La

16   RASA and AIM make their conference presentations.  Both announced their 1000-

17   year, protracted, war against the White Race, so as to reclaim their lands lost and

18   merge, as in the case of La Rasa, California back into Mexico.

19        Someday they hope our Nation's enemies, like Red China and Russia, will win

20   and the United Nations will divide up the American Reich into indigenous providences

21   and recognize their cause and make those colored people the new rulers.  When the

22   Reich falls, they'll go with it.

9

1        Like Hong Cong will be displaced and relocated.  The Communist won't respect

2   Indian treaties; they'll go to the gulags.  Only Anglo-American legalistic culture

3   recognizes contractual deals as real.  Without us White people and our culture, they're

4   lost.

5        Another example of race war last month I was denied access to data that would allow

6   me to report Blacks to the police and to Public Housing.  The black activist, SHRA assistant

7   director, refused to reveal the names of the tenants, who are mostly Black, housed in the

8   public housing apartment complex, so plaintiff could correctly report lease fraud violators as

9   part of his Neighborhood Watch.  The black-activist, assistant-director of SHRA said: "it

10  was against the law" for her to reveal who they are.

11       Plaintiff wanted to reference the so called law on the internet and asked her to cite it.

12  She said : "it doesn't matter, I am just not going to tell you".  She becomes an accessory and

13  is complicit with lease code violators and obstructs justice by hindering plaintiff's efforts to

14  file on-line police reports against the Blacks, who she more than likely considers "her

15  people".

16       Like what is advocated in the New Jim Crow, she protects them instead of doing her

17  job and watching out for everyone, especially the Whites, who face the impact of forced

18  integration where we get overwhelmed by Black People, who move in their friends and

19  relatives after they get accepted into public housing.

20       Plaintiff has to deal with non-tenant, Black, thugs that seek to control the nine story

21  apartment building, with its densely compacted, lucrative, drug, clientele, and its highly

22  sought after parking lot there at Capitol Terrace.

10

AMENDED COMPLAINT

No. 2:19-CV-00060 MCE_DB_PS

1       Lastly, when plaintiff investigated this special racial sensitivity class that Dean

2    Molina mandated, the Black activist, SCC administrator, Ms. Brown, informed plaintiff

3    that SCC doesn't have a Racial Sensitivity Class.

4       Since the sensitivity class, which was mandated, serves to sanction and prevent

5    re-admission, Molina's directive is harassment, and it should be removed from

6    plaintiff's re admission.  Molina should be arrested if he obstructs the court order to re-

7    admit the plaintiff.

8                       MEMORANDUM OF POINTS AND AUTHORITIES

9                                        INTRODUCTION

10      The Bill of Rights the U.S. Constitution was ratified in 1791 after being authored-

11   into a new document that replaced the Articles of Confederation by Virginia

12   Representative, James Madison, during the 1789 Philadelphia Convention where he

13   rewrote the government platform.  Instead of trying to patch-up the unsuccessful Articles

14   of Confederation, Madison, who opposed the Federalists President Adams and his

15   collaborator, Alexander Hamilton's vision of a strong central government drafted a new

16   document, which contained the BILL OF RIGHTS, so they couldn't seize power and

17   tyrannize the people.

18      James Madison, who would become the fourth U.S. President, and Thomas

19   Jefferson, who would become the third U.S. President, opposed the Federalists.  They

20   knew that the Nation's survival depended on its unity, but  LIBERTY needed guarantees.

21   Madison rewrote the Constitution to contain a list of civil liberties in order to get popular

22   vote to support for the new central government.

11

AMENDED COMPLAINT

1    Without the Bill of Rights the new Constitution would not have passed.  The 1st

2    Amendment matters because without it, the nation would not have unified.  Without the

3    new Constitution, which hinged on the Bill of Rights, a patched-up version to the Articles

4    of Confederation would have defaulted as the nation's Constitution.  Without a unified

5    nation by 1800, it's well speculated that American History would be quite different.  The

6    weak central government would have led to armed disputes between States, and eventual

7    foreign interventions.

8    By 1812 Great Britain, the most powerful nation in the world at the time, would

9    have reconquered her lost colonies, and the Eastern Seaboard would have become a part

10    of Canada.   Was it-not but-for the Bill of Rights, the people in the 13-States would not

11    have ratified and unified.  History would be different.  The various State Representatives

12    were to vote.  The Federalist Papers emerged in the press. The common people feared a

13    tyranny. Assurances were needed.

14    The Bill of Rights was to be that assurance against tyranny.  Ironically after the

15    Bill of Rights established the popular support needed to insure LIBERTY over federalist

16    tyranny, the government usurped the Bill of Rights with the 11th amendment.  This

17    allowed the proverbial 'camel' into the tent after spotting its head creeping in from under

18    the flap.  The 11th Amendment allows government perpetrators to get away with on the

19    job murder, searches, and infringements without having to face and be ruined by

20    troublesome, cash damage, claims.

21    James Madison did not come down from Virginia's Old Rag Mountain with a

22    stone tablet, like Moses in Sinai.  Madison came up with the Bill of Rights by researching

23    each State's Constitution to discover what people valued most.

12

AMENDED COMPLAINT

No. 2:19-CV-00060 MCE_DB_PS

1    James Madison then integrate his findings into the New Constitution of 1787.  The

2    various State Constitutions demonstrated that the citizens wanted to: speak their minds,

3    keep their guns, not have army troops billeted in their homes, be judged by juries, be

4    protected by warrants, not be tortured, be left alone, and not get hood-winked (9th

5    Amendment)..  James Madison created the 9th Amendment, his personal legacy to the Bill

6    of Rights, which says rights not listed therein are the un-enumerated rights, which shall

7    not be construed to deny, or disparage other rights retained by the people, like what the

8    11th does to the 1st.

9    Privacy Rights for example are considered by scholars an un-enumerated right,

10   since s privacy isn't listed in the Bill of Rights, it's only assumed, and so it can be

11   assumed that freedom of speech means what it says.

12   The 9th Amendment applies to plaintiff's case because plaintiff has the right to

13   expect a continuity of truthful words to enforce damages against infringement of his

14   LIBERTY to speak his mind and write provocative essays.

15   This right to have an attitude is protected by the 9th Amendment because the 1st

16   Amendments needs to mean what is says.  The right to freedom of speech is expected to

17   be enforceable, and damages to be measured in money, because money makes damages

18   creditable. The 11th Amendment's immunity usurps reasonable expectations and

19   befuddles the essence of the LIBERTY that it's expected to protect.  Therefore an

20   INJUNCTION is sought.

21

22   ///

13

AMENDED COMPLAINT

1        FACTUAL ALLEGATIONS

2              For the past 15-years or so, plaintiff attended Sacramento City College, a community

3        college linked to the DISTRICT.  This occurred after being accepted into Public Housing and

4        awarded Social Security disability, so as to have a dormitory and a scholarship of sorts.

5              Plaintiff first enrolled in an off-campus extension called the 'Downtown Campus'.  At

6        the time the DISTRICT had a satellite campus located on 4th Street and administered by Dean

7        Debra Luff.  Plaintiff sought to cost effectively study law after being expelled from University

8        of Northern California, Lorenzo Pitino, School of Law's, paralegal program on J Street in

9        2005.  In 2006 Plaintiff came to DISTRICT in the quest to continue his study in law by taking

10       classes in public speaking, business law, real estate law, and whatever they had, a course of

11       study called:  Administration of Justice (A/J).

12             After inheriting a few thousand dollars from the Living Trust partially left to him

13       by his late step mother, plaintiff choose to invest in education, and study law at UNC

14       where he previously attended 20-years earlier.  Since the White plaintiff wasn't

15       apparently going to get a PhD scholarship, his CSUS advisor, Professor Warren Snyder,

16       suggested he attended the newly established University of Northern California School of

17       Law.   At a rate of taking one or two classes a semester from 1982-to 1986 plaintiff

18       studied the UNC 1st year law agenda, while he worked his self-employment reselling gear

19       obtained from military auctions associated with base closures around the Bay Area and

20       Sacramento Valley.  This seem to be going well until he failed the Baby Bar Exam in

21       1985; then he failed it again.  These failed Baby Bar exams deselected him from

22       continuing law school and becoming a lawyer. Nonetheless plaintiff finished classes in:

23       Agency Law, Legal Research, Crimes, Torts, Contracts, Evidence, and Civil Procedures.

14

AMENDED COMPLAINT

1       Suddenly plaintiff faced a 'residence free lifestyle'.  Plaintiff was evicted because

2       the new owner of the building where he lived want it demolished.  This eviction, BAR

3       exam failure all occurred around the same time as the dead of his father.  So plaintiff

4       'devolved'.

5       For the next decade plaintiff camped out of his truck while sleep-parking in San

6       Francisco's China Basin, or along the Great Highway below the Cliff House.  There in

7       San Francisco from 1996 to 1997 plaintiff followed the advice of S.F. unemployment

8       office and studied latest Computer Applications at S.F. Downtown, City College,

9       Campus, which by the way is on the same block as the U.S. Court of Appeals, so plaintiff

10      knows exactly where to go if ECF is denied again.

11      Plaintiff comes to DISTRICT after failing his studies in an unaccredited law

12      school.  Circumstances made him homeless in 1987, so he slept in his pick-up truck and

13      parked on the Streets of San Francisco until Congressman Matsui transferred his SSI

14      claim from San Francisco to Sacramento in 1998 where plaintiff camped-parked on W

15      Street until 1999 when he was admitted into Public Housing.  At UNC in 2005 plaintiff

16      was a 57 years old, Aryan-looking, hooky-nose, blue-eyed, blonde-haired, Anglo Saxon.

17      Apparently he didn't fit-in with the student body and the school's hidden agenda.  One

18      day a big shot, Native American, Dean with an affirmative-action job at the State Capitol

19      called plaintiff into his office, a reconverted storage room with junk still in it, and

20      expelled him.  The UNC Dean told plaintiff that he "stinks", fails the "melanin test', and

21      must leave the school.  Although plaintiff paid $3000 in tuition and had already finished

22      classes on criminal law, arbitration, and was just starting family law; the Indian had the

15

AMENDED COMPLAINT

1    power to do it, so he did.  Since UNC was a private school, they can make-up their own

2    rules, and do whatever.

3            There was no recourse, but to appeal.  Plaintiff appealed to the owner, Lenard

4    Padilla.  Padilla told him to "eat crow".  Padilla is now Secretary of State, but then he

5    operated out of a bail bonds office on J Street not far from the Matsui Federal Court.

6    Dean Padilla recognized the personality problem with the Indian Dean, apologized, and

7    refunded plaintiff's money.

8            Plaintiff then recycled the $3,000 cash tuition refund to upgrade his vehicle.

9    Plaintiff's 1974, Chevy, C-20 , P/U truck, which he has owned now for 35-years was

10   replaced with a nice clean looking Red, 1989, Ford Bronco.  Both are listed in plaintiff

11   IFP Application.  Plaintiff's Bronco has been his primary vehicle now for the last 15-

12   years, so plaintiff would like very much for defendants to offer him a new SUV as a gift

13   to show their good faith, and to amend the problem they caused by being tyrannical

14   fascists.

15           Plaintiff joined DISTRICT to study law at one of its remote locations.  Plaintiff

16   was suspended in 2006, retuned in 2007, and graduated in 2011 with an AA-degree in

17   Administration of Justice; then continued there at Sacramento City College until

18   suspended again in 2018.

19           This is how plaintiff was suspended from DISTRICT the first time.  In 2005 the

20   Down Town, City College, Campus held Administration of Justice law courses at the

21   State Office Building of Correction on 15th and 'R' Streets a few blocks away from

22   SHRA Capitol Terrace where plaintiff would walk or bike. Plaintiff attended classes

16

AMENDED COMPLAINT

1    there for a number of semesters before getting suspended for a 1-year because certain

2    people didn't like his attitude and tone of his voice.

3         As 'group-leader' plaintiff scolded his crew during an off campus, 'group'

4    meeting.  This meeting was a required 'group session' to get ready for a 'mock, crime-

5    scene, investigation, group, presentation'.  Group members screwed-up during the

6    investigation phase of the class, and plaintiff's criticism offended the lofty State Workers

7    in the group, who figured themselves his betters.  They complained to the teacher, a

8    former, DEA agent, Richard Harris, who sided with them, had the campus police escorted

9    plaintiff from the building, and then had him summoned to a student court, and

10   suspended.  After the 1-year suspension plaintiff returned and attended the main campus

11   for classes instead of the State office building.  Plaintiff earned two diplomas doing that

12   time period :  Administration of Justice in 2011 and Psychology in 2014.

13        In 2015 a Gerontology AA Degree was sought, because plaintiff was getting old

14   and need to better understand his health condition.  Plaintiff registered for on-line classes

15   in Nutrition, Biological Gerontology, and the Psychology of Gerontology, and others; but

16   dropped them because they were boring.   Each semester plaintiff would search the list of

17   A/J and psychology courses offered hoping to find something 'cool' instead of boring

18   Gerontology prerequisites like 'Death and Dying'.

19        In the Fall Semester of 2018 an on-line, Administration of Justice class was

20   substituted for an on-line Biology Class. Plaintiff entered Professor Logan's 'Sociology'

21   class because it was new and listed as an Administration of Justice course, which are

22   'cool'.  It involved a special interest, the Police State.  A class called 'deviancy and social

23   control' was being offered.

14

AMENDED COMPLAINT

1        Soon after his attendance to Professor Logan's Social Control class plaintiff's

2    essays to class assignments got plaintiff suspended for two years. Plaintiff followed

3    administrative law appeals, lost, and filed a civil rights, civil case on 1-9-19, which was

4    dismissed without prejudice on May 18-20 with leave to amend within 60-days—July 17,

5    2020.

6        The 1st Amendment violation issue was not dismissed because plaintiff was

7    wrong and defendant was right. The case was dismissed because the 11th Amendment

8    immunity for government officials from having to pay CASH RELIEF invoked a no

9    cause of action under FR 12. Although plaintiff case was dismissed, the case wasn't lost.

10        Plaintiff did not lose the case about his freedom of speech being violated by

11    Sacramento City College's Professor Logan, Dean Molina, General Council J.P. Sherry

12    and SCC President Gutierrez, it only means plaintiff can't recover monetary damages

13    from those government bureaucrats for their ON THE JOB, unconstitutional, breach of

14    procedures, and professional malpractice.

15        This Amended Complaint changes all that to an INJUNCTION to re admit

16    without the racial sensitivity class training. This Mind Control Class—RACIAL

17    SENITIVITY TRAINING, according to Dean Molina must be taken off campus and paid

18    for by plaintiff, so as to make plaintiff see the errors of his ways, and conform his

19    thinking to political correctness. Such devices have already been decided by the Supreme

20    Court as unconstitutional. Plaintiff opposed the themes proposed by Michelle Alexander,

21    a black activist, who authored The New Jim Crow with parody and fun as she tells her

22    followers to make it, then use it for the cause.

18

AMENDED COMPLAINT

1       In UWM Post v. Board of Regents of the University of Wisconsin, 774 F. Supp.

2       1163 (E.D. Wis. 1991) a federal district court ruled in a matter, similar to plaintiff's case,

3       and his essays.  It states that Policies that prohibit speech, which "demeans the race, sex,

4       religion, color, creed, disability, sexual orientation, national origin, ancestry or age of the

5       individual or individuals; and creates an intimidating, hostile or demeaning environment

6       for education…are UNCONSTITUTIONAL."  The court struck down the speech codes

7       and ruled that "the suppression of speech, even where the speech's content appears to

8       have little value and great costs, AMOUNTS TO GOVERNMENTAL THOUGHT

9       CONTROL."

10                                        ARGUMENT

11       Plaintiff amends his original complaint to include:

12       1)  Two additional U.S. Constitutional Amendment violations—the 9th and the 14th

13              Amendments;

14       2) Only injunctive relief sought, instead of cash, and

15       3) Some new defendants—Molino and Gutierrez, instead of just Sherry..

16       Changes in damages vitalizes this case, so as to circumvent the 11th Amendment's

17       immunity to cash liability, and substitute injunctive relief.

18       Since Molino acted as prosecutor and Gutierrez rendered Judgement, they prosecuted

19       and ruled.  Therefore, they are the proper DISTRICT defendants for the injunction that

20       can reinstate plaintiff and restore plaintiff's status quo ante without dings to plaintiff's

21       otherwise pristine school record.

AMENDED COMPLAINT

No. 2:19-CV-00060 MCE_DB_PS

1        These new defendants have the authority to reinstate the plaintiff, clear the

2    official records of his alleged wrong doing, and change their unconstitutional regulations;

3    whereas J.P. Sherry, the former, human, defendant for the DISTRICT doesn't have that

4    authority to execute the injunction.

5        Cash was originally listed as relief damages because plaintiff's legal research led

6    him to believe that a claim needed to be reduced to a cash value, which could be

7    awarded.  Like what it says in the court's legal form on the INJUNCTION damage

8    section, part-IV entitled: Irreparable Injury.  It says :

9        "Explain why monetary damages at a later time would not

10        adequately compensate you for the injuries you sustained, are sustaining,

11        or will sustain as a result of the events described above, or why such

12        compensation could not be measured."

13        Originally, money was offered an alternative to firing the administrators.

14    The original complain wanted an either-or-injunction, which was cash, or the

15    administrators fired.  Expenses had to be listed in the original complaint, so they

16    were, which led to the case being dismissed.

17        Sacramento City College's Disciplinary Department's Dean Molina suspended

18    plaintiff for two years because of unappreciated, hyperbole, race-based, essays on

19    controversial, race-based, issues offered up by Professor Logan, an ex-jailer, from his

20    assigned reading on a book entitled The New Jim Crow.

21        Written words were used to analyze observations, opinions, and ideas.  Plaintiff

22    didn't hit anybody or make a personal threat.  No assaults were committed.  Yet plaintiff

20

AMENDED COMPLAINT

1    was charged with being assaultive, because plaintiff wrote in his essay that he would

2    "fight to kill, if attacked".

3           Plaintiff went on to submit a Sacramento Police Department Incident Report

4    number in an Opposition Paper about his will to kill.  Plaintiff defended off an attack he

5    had at the front door of his apartment on 3/31/19 against a Black gangster, who doped-up

6    and sent to attack him because of his Neighbor Watch duty exposed their trafficking out

7    of the parking lot.  Plaintiff's Bronco crashed into one of their trucks and police got

8    involved.  Killing his assailant, is hyperbole.  Cabrellis, the attacker, was not killed, only

9    wounded and humiliated.

10          In urban areas those of us who fail the "melanin test" are in a milieu of colored

11   people, who are organized by their color, fight in gangs, prey upon the weak, harass the

12   strong, and seek to take whatever they can get away with.

13          Plaintiff allegedly committed an assault by DISTRICT's standards by saying he

14   would fight, rather than roll-over to their dominance.  District's General Counsel, Mr.

15   J.P. Sherry, gave Dean Molino the LEGAL clearance to proceed against the plaintiff, so

16   as to have him suspended.  Micheal Gutierrez, the SCC President, then did that.   Sherry,

17   Molina, and Gutierrez are culpable.

18          General Consul, J.P. Sherry, directed the DISTRICT through Dean Molino to

19   prosecute the plaintiff, and then SCC President Gutierrez rendered the judgement.  In

20   doing this they violated plaintiff's Constitutional Rights covered under the First and the

21   Fourteenth Amendments under the legal principle of SELECTIVE INCORPORATION,

22   in which the Bill of Rights applies to States and local principalities.

AMENDED COMPLAINT

No. 2:19-CV-00060 MCE_DB_PS

1    The NINTH AMENDMENT is violated by allowing 11th Amendment to usurp the

2    meaning of the 1st Amendment.  The 11th Amendment allows the consequences for

3    violating free speech to go unenforced for governmental officials as they strip away the

4    assurances established in 1791.  The court system and defendant violate the 9th

5    Amendment.  This 9th Amendment violation renders OFFICIAL WORDS about

6    plaintiff's protected LIBERTY to mean something other than what they say, so as to

7    usurp the CONSTITUTION by giving governmental immunity to bureaucrats, who

8    violate with impunity a citizen's right to freely express oneself in a pedagogical context.

9    Plaintiff invokes his rights to be recognized as a regular person instead of a racial

10   extremist.  Plaintiff insists that his protected free speech aren't "spurious" as proclaimed

11   by the court order as it dismissed the case because plaintiff is an American, whose

12   LIBERTY the federal district court is sworn to protect.

13   In 1848, one hundred years before plaintiff's birth, Isaac Lea, plaintiff's mother's

14   grandfather was here in Sacramento from Yorkshire, England with his brothers after they

15   crossed the plains in a covered wagon amidst a wagon train of pioneers.  They're

16   registered in the State Archive.  Isaac Lea once owned that land over there where the

17   Spaghetti Factory Restaurant is now located on K Street next to the railroad tracts.  Isaac

18   Lea's home and farm was on Hedge Road in the New Brighton Township off the Jackson

19   Highway.  It ran south to Florin.  Plaintiff's relatives, the Leas and the Scofields, have

20   been here in Sacramento ever since California became a State.   The Lea brothers, their

21   sister Hanna Scofield and her husband Joe and his brother James are buried in the pioneer

22   cemetery on Elder Creek Road.

AMENDED COMPLAINT

1   These English people raised crops, cattle, olives, kids, and community leaders

2   like, John Scofield, Isaac's nephew and executor of his estate.  He was elected Chairman

3   of the Council in the early days of Sacramento.  After Isaac's death in 1892 his wife, five

4   daughters, and son, Eunice, all moved to their property called Green Island Ranch around

5   Val Nap along the Napa River, not far from Mare Island Naval base in Vallejo, plaintiff's

6   birth place, where plaintiff's mother's father, Perry Wells, worked, and befriended

7   Eunice, who had an eligible sister for marriage, Mabel Lea, one of the heiress daughters

8   of Isaac Lea.  They married in 1911, and the worldly Perry Wells with his gun took

9   charge, ran off their enemies, sold the ranch, took his share of the money from the estate,

10  and relocated Mabel, her mother, and his kids to Redwood Valley in Mendocino County

11  to start a vineyard.

12  There plaintiff's mother, Harriet Wells, was born there in 1922.  Well's Redwood

13  Valley Vineyard went broke when Prohibition destroyed the wine market.  Perry Wells

14  sold out, and moved his lot to San Francisco where Harriet graduated from Mission High

15  School in 1940.  Her older brother and sister enlisted and served in WWII.  Leola Wells

16  was a Marine Corp, Headquarters, office worker, who would later serve Mayor Alioto,

17  and her brother Stanley fought as an infantryman during D-Day, crossed the Rhine in

18  1945, and then guarded prisoners during the Nuremburg trial.  When Uncle Stanley

19  returned to the San .Francisco, .Bay Area, he became a police investigator in Oakland.

20  Although Harriet's father, Perry Wells, also descended from the English, he was also part

21  Indian and maybe Hebrew.

22  The early Wells families immigrated to Connecticut around 1650 from England.

23  Daniel Wells was a community leader and fought in the Revolutionary War.  He and

23

AMENDED COMPLAINT

1    other family members were awarded land grants in Illinois near Molina where the Grants

2    would start their harness shop, and Abe Lincoln spent time.

3         There at Rock Island, Illinois Joel Wells III, Perry's grandfather, married a Native

4    American woman, Mary Huntington, who lived from 1802 to 1894.  Mary Huntington as

5    a young child was rescued and raised by White Missionaries after Tecumseh's Shawnees

6    were decimated during the Black Hawk war.  The Algonquin speaking Indians forced

7    onto the Western Plains by the White migration become known as the Cheyenne.

8         Plaintiff's great, great, grandmother although an acculturated member of the

9    White Community was a colored-person, a pure blooded Indian, whose sons, James and

10   John, were half breeds that looked like mestizos from their photos.  They were around

11   30-years old during the days of Buffalo Bill Cody in 1878.  Plaintiff also has a tin-plate

12   photo of Mary Huntington and a photograph of a painting of Judge Joel Wells II, Joel

13   Wells III's father according to aunt Leola.  After the death of his son, Indian Mary's

14   husband, 'Indian Mary' remarried a few times, and then lived alone in an old cabin on

15   free, reservation, land near Rock Island, where she at 88-years old, smoked tobacco from

16   a corn cob pipe, and helped raise her 11-year old grandson, Perry Wells, Plaintiff's

17   grandfather, after the death of his mother, the Scotch-Irish-looking, Sadie Looker, whose

18   father James Looker died as a Union solider during the invasion of Vicksburg in 1863.

19        Although family lore claims James Looker was a Calvary officer, plaintiff's

20   genealogical research revealed he served as a corporal in the 26th Illinois, mounted-

21   Infantry, fought at the 1862 battle of Shiloh, rode with Garrison's Raiders, and died at the

22   union hospital at LaGrange, Tennessee of measles.  It's believed he received a battle field

23   commission, but it was never registered.  His widow, Sara Koch, is on record for years

AMENDED COMPLAINT

1    appealing to get his pension.   Lt. Looker's grandson, Perry Wells, joined the Army

2    instead of going to reform school.  There in the Army Wells fought alongside Teddy

3    Roosevelt's rough riders in Cuba during the Spanish-American War.

4          Plaintiff's American roots run deep with heritage claims.  If Perry was ¼

5    Shawnee Indian, plaintiff is a 1/16th Native American, and if dark haired, Sara Koch,

6    Sadie Looker's, Pennsylvania Dutch mother, was of Hebrew origins, like some suspect,

7    then plaintiff would only be 7/8th White on the matrilineal side because Perry Wells was

8    25% Shawnee and 25 % Hebrew.

9          The point here is that plaintiff is a mixed race person and therefore can't be

10   categorized as a racist-supremacist because of his critical evaluations of the New Jim

11   Crow book based upon his analysis from his reading and observations.  Plaintiff is part

12   Indian and maybe part Jew.

13         When plaintiff sought membership in the neighborhood, J Street, Medi-Cal

14   funded, Native-American, Health-Clinic (NAHC) plaintiff had to fill-out a document as

15   to whether-or-not he is a Native American.  Since NAHC needed that data for their

16   funding, plaintiff said "yes".  Stern brown people informed him that only those people

17   capable of documenting their heritage through the Dawhl's list can be considered Native

18   Americans.  Therefore plaintiff is White.

19         Plaintiff's, Anglo-American, early, historical, background goes back to the

20   English Colonies with Daniel Wells, and Manifest Destiny with Isaac Lea.  Plaintiff's

21   genes are linked to Tecumseh's Shawnees through Mary Huntington, and the Christian

22   converted Dutch Hebrews, who daughter married Lt. James Looker, father of Sadie, who

AMENDED COMPLAINT

1    married John Wells, the half breed Shawnee, whose Indian grandmother raised plaintiff's

2    grandfather in 1890.

3    Since photos of Sara Koch and her family reveal people of dark complexion,

4    black hair, and hooky noses, elders in the Wells family claim that their father was only

5    half White.  Perry Wells was 25% Shawnee and 25% Hebrew. This mixed heritage gives

6    plaintiff leave to freely critize his own as another colored person.

7    From Isaac Lea to Mary Huntington and Sara Koch plaintiff is a mixed raced

8    individual, who should be freed from the aspersions of advocating racial supremacy,

9    which critics of his essays use to demean him and assert their moral preeminence.

10   Through the community participation and contributions of the Leas and the

11   Scholfields since 1848 plaintiff claims that the LOS RIOS COMMUNITY DISTRICT is

12   part of his social inheritance, and DISTRICT's suspension is a civil rights deprivation.

13   The Bill of Rights, which ancestor, Daniel Wells, fought to ensure, entitles plaintiff to

14   write provocative essays in silly sociology classes whenever he wants too.

15                                   LEGAL STANDARDS

16   Among other things the 1st Amendment to the Bill of Rights in the U.S.

17   Constitution says that: "Congress shall make no laws abriding the freedom of speech.  A

18   reasonable prudent person might well assume that the first amendment to a Bill of Rights

19   would supersede an 11th Amendment, which is not even in the Bill of Rights.  Typical

20   citizens don't know what the 11th Amendment means, or why it should give cash damage

21   immunity to those bureaucrats, who violate it.

26

AMENDED COMPLAINT

1       The Eleventh Amendment needs a legal specialist, or an authority-abusing-

2   government worker to know the loop hole that allows civil rights violators immunity

3   from cash damage awards when they get caught abusing their authority.

4       Whereas, an injunction, on the other hand, can have those who are accountable

5   arrested for failure to comply with its court order to do something.

6       In *Healy v. James*, 408 U.S. 169, 180 (1972) the Court stated that "the vigilant

7   protection of constitutional freedoms is nowhere more vital than in the community of

8   American schools."

9       THE COURT HELD THAT "THE MERE DISSEMINATION OF IDEAS,

10                  NO MATTER HOW OFFENSIVE TO GOOD TASTE,

11                       ON A STATE UNIVERSITY CAMPUS

12                     MAY NOT BE SHUT OFF IN THE NAME OF

13                        'CONVENTIONS OF DECENCY.'"

14       The law says public universities are government actors.  Since Sacramento City

15   College is a public school; its officials must respect freedom of expression on campus,

16   and when they don't, they need to be held accountable like what it says in the Bill of

17   Rights and 42 USC 1983.

18       Courts have ruled that student handbooks, and other related materials are non-

19   binding contracts.  That means that school speech code rules don't have to be precisely

20   followed and consequences for students, who breach them, are unenforceable.

27

AMENDED COMPLAINT

1          DISTRICT's 'speech code' regulations are unconstitutional because case law holds

2     that in public-universities speech codes are campus regulations that punish, forbid,

3     heavily regulate, or restrict a substantial amount of protected speech, or what would be

4     protected speech in society at large.  The court stated that speech code policies are

5     entirely incompatible with freedom of expression, and the daily reality of communication

6     in our modern liberal democracy.  For the last 20-years public-university, speech-codes

7     have been found unconstitutional by federal and state courts.

8          In <u>Doe v. University of Michigan</u>, 721 F. Supp. 852 (E.D. Mich. 1989) a federal

9     district court found the speech provisions in their harassment code to be

10    unconstitutionally overbroad because the code forbade:

11         "any behavior, verbal or physical, that stigmatizes or victimizes an

12         individual on the basis of race, ethnicity, religion, sex, sexual orientation,

13         creed... and that... creates an intimidating, hostile, or demeaning

14         environment for educational pursuits...".

15    Hence it is unlawful for a government sponsored school to forbid written

16    opinions, even if they are unpopular.

17         The Supreme Court has consistently held that statutes punishing speech or

18    conduct solely on the grounds that they are offensive is unconstitutionally overbroad.

19    Similarly like plaintiff's essays about god's-children, the white-devils, and the wet-backs,

20    in <u>UWM Post v. Board of Regents of the University of Wisconsin</u>, 774 F. Supp. 1163

21    (E.D. Wis. 1991) a federal district court ruled unconstitutional policies that prohibited the

22    expression of ideas through spoken and written words that:

AMENDED COMPLAINT

No. 2:19-CV-00060 MCE_DB_PS

1    "demeans the race, sex, religion, color, creed, disability, sexual orientation, national

2    origin, ancestry or age of the individual or individuals; so as to create an intimidating,

3    hostile or demeaning environment for education…".

4        The court ruled that "the suppression of speech, even where the content appears to

5    have little value and great costs, AMOUNTS TO GOVERNMENTAL THOUGHT

6    CONTROL."

7        In <u>Dambrot v. Central Michigan University</u>, 55 F.3d 1177 (6th Cir. 1995) the

8    school had a controversial discriminatory harassment policy that defined racial and ethnic

9    harassment as "any intentional, unintentional, physical, verbal, or nonverbal behavior that

10   subjects an individual to an intimidating, hostile or offensive educational, employment or

11   living environment by demeaning or slurring individuals, or using epithets, or slogans

12   that infer negative connotations about the individual's racial or ethnic affiliation."

13       The Sixth Circuit found the policy to be both unconstitutionally vague and

14   overbroad. The unconstitutional policy was 'content-discrimination' based on "viewpoint

15   discernment".

16       Former Chief Justice Marshal ruled that the 1st Amendment means that

17   government school administrators can't restrict expression because of its message, ideas,

18   subject matter, or content.

19       'Content based laws' face strict scrutiny, the highest form of judicial review.

20   .    Content based laws are viewed by the Supreme Court as THOUGHT CONTROL, a

21   compelling interest to overrule.

29

AMENDED COMPLAINT

No. 2:19-CV-00060 MCE_DB_PS

1    The First Amendment applies on the public university campus is settled law.

2    Public universities have long track record in the Supreme Court for First Amendment

3    jurisprudence.  The First Amendment protections on campus are necessary for the

4    preservation of our democracy.   In Sweezy v. New Hampshire, 354 U.S. 234, 250 (1957)

5    the Court wrote that: "To impose any strait jacket upon the intellectual leaders in our

6    colleges and universities would imperil the future of our Nation, because teachers and

7    students must always remain free to inquire, to study and to evaluate, to gain new

8    maturity and understanding; otherwise our civilization will stagnate and die".

9    The Supreme Court favors free speech.  In Keyishian v. Board of Regents, State

10   Univ. of N.Y., 385 U.S. 589 (1967) the Court rejects regulations that cast a "pall of

11   orthodoxy over the classroom. " in favor of the expression of "treasonable or seditious"

12   issues.   In Healy v. James, 408 U.S. 169, 180 (1972) the Central Connecticut State

13   College's president lost in court when he prohibited a violent, left-wing, student group

14   from speaking . The school's president said the group's philosophy was "antithetical to

15   the school's policies," and it "would be a disruptive influence at the college."  The Court

16   stated "the vigilant protection of constitutional freedoms is nowhere more vital than in

17   the community of American schools."

18   In Papish v. Board of Curators of University of Missouri, 410 U.S. 667 (1973) the

19   Court held that "the mere dissemination of ideas-no matter how offensive to good taste

20   when used on a campus may not be censored in the name of 'conventions of decency.'"

21   Student rights and obligations policies are speech codes that censor and sanction.

22   Pennsylvania State University prohibited students, so they can't "taunt, ridicule, or

23   insult" other students without getting suspended.

30

AMENDED COMPLAINT

No. 2:19-CV-00060 MCE_DB_PS

1    At the University of Alabama their computer use policies prohibits "any

2    inappropriate e-mail," including "unofficial, unsolicited e-mail.  Although policies are

3    enacted out of impulse to "protect" students from "harm," the court ruled that they are

4    entirely incompatible with freedom of expression, and the daily reality of communication

5    in our modern liberal democracy.

6    In <u>Doe v. University of Michigan</u>, 721 F. Supp. 852 (E.D. Mich. 1989) a federal

7    district court found the speech provisions of the school's harassment code to be

8    unconstitutionally overbroad.  The unconstitutional speech provision prohibited :

9    "any behavior, verbal or physical, that stigmatizes, or victimizes an

10   individual on the basis of : race, ethnicity, religion, sex, sexual

11   orientation, creed, so as to create an intimidating, hostile, or demeaning

12   environment for educational pursuits, employment, or participation in

13   University sponsored extra-curricular activities."

14   The Supreme Court regards statutes that punish speech because of offensive

15   words are unconstitutionally overbroad.  The court held that "regulations that prohibit

16   speech on the basis of listener reaction alone is unconstitutional both in the public high

17   school and university settings."

18   In <u>Roberts v. Haragan</u>, 346 F. Supp. 2d 853 (N.D. Tex. 2004) a federal district

19   court considered a speech code to be "facially overbroad, and no matter how offensive"

20   when they forbids the use of written threats, electronically transmitted threats, insults,

21   epithets, or ridicule. The federal district court goes on to list : appearance, personal

22   characteristics or group membership, including, race, color, religion, national origin,

31

AMENDED COMPLAINT

1    gender, age, disability, citizenship, veteran status, sexual orientation, ideology, political

2    view or political affiliation".

3                                    CONCLUSION

4           There is enough exhibits, legal evidence, and Supreme Court decisions to render a

5    stare decisive ruling in plaintiff's favor against DISTRICT when compared to what has

6    been decided and presented.  Plaintiff's essays that got him suspended are clearly

7    protected free speech.

8           Regulations that were applied against him for his expression are unconstitutional.

9    The 'on-line essays' were not graffiti, or some personal rampage done to whip-up a riot.

10          They were class assignments restricted to a discussion board that needed

11   passwords to enter, so as to submit assignments, participate, read, react, and write back-

12   and-forth among the students in the class.

13          The cause of action comes from the federal Civil Rights Act of 1871, which

14   states: "Anyone who causes a citizen the deprivation of any rights, privileges, or

15   immunities secured by the Constitution and laws, shall be liable to the party injured in an

16   action at law, suit in equity, or other proper proceeding for redress" 42 U.S.C. 1983,

17   1985, 1986 (2000).

18          Administrators Molina and Gutierrez's abuse of their governmental job positions,

19   defamed plaintiff's academic records, and deprived him from the use of all of the

20   DISTRICT's public educational resources for two years because they didn't like what he

21   wrote.

32

AMENDED COMPLAINT

No. 2:19-CV-00060 MCE_DB_PS

1    Plaintiff's ideas expressed in those classroom essay assignments were protected

2    free speech.  Therefore, a COURT ORDERED INJUNCTION that compels Molina and

3    Gutierrez to use their authority to re-admit plaintiff to his status quo ante should be

4    enforced, so that they can be held in contempt of court and arrested when they refuse, or

5    obstruct.

6    They were wrong, and plaintiff is right.

7    The FIRST[t] Amendment to the Bill of Rights means the government can't

8    suppress what gets said or written.  In Healy v. James the dissemination of ideas on

9    campus can't be censored in the name of conventions of decency.

10    In Papish v. Board of Curators (1973) (410 US 667) court held that student were

11    improperly expelled for using profanity to express dissent. .

12    Plaintiff's injunctive relief needs to restore plaintiff amidst this harassment and

13    injustice.  Since the two year suspension will conclude before this case gets settled, a

14    court order will have to force Molina and Gutierrez to comply with the re admission

15    without the RACIAL SENITIVITY CLASS TRAINING.

16    Expungement, policy changes, and no racial sensitivity class training are sought

17    in this injunction for relief.  Plaintiff is prepared to sit out the Spring-2021 semester, re-

18    admission-process until after the injunction is made a court order.  Plaintiff wishes to

19    return with the authority to have the USM arrest Dean Molina for obstruction when he

20    fails to comply.

33

AMENDED COMPLAINT

No. 2:19-CV-00060 MCE_DB_PS

1        Plaintiff seeks the Federal District Court ruling in plaintiff's favor for DISTRICT

2    policy changes, expungement of sanctions, and admission without the mandated

3    RACIAL SENITIVITY CLASS TRAINING DIRECTIVE.

4

5

6

7

8    x. Richard Francis

9    DATE : 7/13/20

10

11

12

34

AMENDED COMPLAINT

1

2

3

4   Richard H. Francis, pro se
5   1820 Capitol Avenue, Apt #210
6   Sacramento, CA 95811
7   916,498-8427
8   TigerStripe-2@outlook.com

9

10

11                      UNITED STATES DISTRICT COURT

12                  FOR THE EASTERN DISTRICT OF CALIFORNIA

13

14   RICHARD H. FRANCIS            /            No. 2:19-cv-00060 MCE DB PS

15   Plaintiff

16                                        DECLARATION OF RICHARD FRANCIS

17                                   IN SUPPORT OF THE AMENDED COMPLAINT

18   Vs.

19   Defendants

20   LOS RIOS COMMUNITY COLLEGE /

21   DISTRICT (LRCCD) or (DISTRICT)—General Council, Sherry

22   1919 Spanos Court, Sacramento, CA 95825

23   916,568-3021

24   New Defendants : Michael Gutierrez and Miguel Molina

25

                                      1
     Declaration in support of Amended Complaint

1    I, Richard Francis, declare as follows:

2    1.   I am a pro se attorney, and therefore an officer of the court in this matter.

3    2.   Plaintiff's civil right TO FREEDOM OF SPEECH  was violated, and he

4         filed a complaint in federal district court, which was dismissed because of

5         a technicality,

6    3.   This 11th Amendment technicality was corrected with this Amended

7         Complaint for an INJUNCTION.

8    4.   Plaintiff clearly states why personal service is requested in the body of the

9         Amended Complaint, which is 'the need to compel compliance'.

10   5.   Plaintiff seeks to have Molina and Gutierrez arrested if they fail to execute

11        the court order as requested.

12             I declare under penalty of perjury under the laws of the State of

13   California that the foregoing is true and correct and that this declaration

14   was executed on July 13, 2020 with the filing of plaintiff's Amended

15   Complaint..

16

17

18

19                                          Richard Francis

2

Declaration in support of Amended Complaint

No. 2:19-CV-00060 MCE_DB_PS

1

2

3

4

5   Richard H. Francis, pro se
6   1820 Capitol Avenue, Apt #210
7   Sacramento, CA 95811
8   916,498-8427
9   TigerStripe-2@outlook.com

10

11

12                  UNITED STATES DISTRICT COURT

13           FOR THE EASTERN DISTRICT OF CALIFORNIA

14

15   RICHARD H. FRANCIS            /          No. 2:19-cv-00060 MCE DB PS

16   Plaintiff                     /          CERTIFICATE OF SERVICE

17   Vs.

18   Defendant                     /

19   LOS RIOS COMMUNITY COLLEGE  /

20   DISTRICT (LRCCD) or (DISTRICT)—General Council, Sherry

21   1919 Spanos Court, Sacramento, CA 95825

22   916,568-3021

23   New Defendants:

24      1)  Michael Gutierrez, President, 916, 558-2101,

25       Rhoda Hall North room #277 at 3835 Freeport Blvd,

26      Sacramento CA. 95822;

27      2)  Miguel Molina, Student Discipline Officer,

28      916, 558-2438 Student Services Office room 105-109

1

Certificate of Service for Amended Complaint

1    at 3835 Freeport Blvd, Sacramento CA. 95822

2    <u>Attorney for Defendant</u>

3         Louis A. Leone, SBN: 099874, & Seth L. Gordon, SBN: 262653

4         1390 Willow Pass Rd, #700, Concord, CA 94520

5         925, 974-8600, Fax 925, 974-8601

6         <u>lleone@leonealberts.com</u>

7              I, Richard H. Francis, hereby certify that I am an American Citizen and competent

8    to serve papers.  I further certify that on this date 7/ 13/20 I caused copies of documents

9    entitled:

10             1) AMENDED COMPLAINT,

11              2) COMPLAINT AND REQUEST FOR INJUNCTION,

12               3) COMPLAINT FOR VIOLATION OF CIVIL RIGHTS,

13             4) DECLARATION, and

14             5) CERTIFICATE OF SERVICE.

15             Together they were mailed to the Attorney for Defendant, Louis A. Leone,

16    SBN: 099874 at1390 Willow Pass Rd, #700, Concord, CA 94520; which is the address

17    given by them, and paid for at the U.S. Post Office where the envelope and its documents

18    were weighed, paid for, and given to the clerk to be routed accordingly by the U.S. Mail

19    Service to the defense attorney.

20    Dated: 7/13/20

21    X _____

22    Richard H. Francis,
23    1820 Capitol Ave. #210, Sacramento, CA 95811
24    916, 498-8427
25

2

Certificate of Service for Amended Complaint